## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| FREDERICK BAYNES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:15-CV-1604 (LMB/TCB) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the Court is the United States' Motion to Dismiss [Dkt. No. 30], Feb. 12, 2016, in which the United States ("defendant" or "the government") argues that the sole remaining count in Frederick Baynes' ("plaintiff" or "Baynes") Complaint is barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. United States' Mem. of Law in Supp. of its Mot. to Dismiss at 2 [Dkt. No. 31], Feb. 12, 2016 ("Def.'s Mem."). Plaintiff, pro se, has filed an opposition to the government's motion, see Pl.'s Reply Mot. to Gov't's Mot. to Dismiss [Dkt. No 33], Feb. 25, 2016 ("Pl.'s Opp'n"), to which the government has responded. See United States' Reply Mem. of Law in Supp. of Its Mot. to Dismiss [Dkt. No. 34], Mar. 3, 2016 ("Reply"). On June 24, 2016, this motion was converted to one for summary judgment. Order [Dkt. No. 38], Jun. 24, 2016. The government has provided additional evidence to support its motion, United States' Resp. to the Court's Order [Dkt. No. 37], Jun. 13, 2015 ("Gov't Resp."), and Baynes has filed a reply along with two additional exhibits. Reply Mot. [Dkt. No. 42], Jul. 11, 2016. For the reasons that follow, summary judgment will be granted in the government's favor.

## I.   PROCEDURAL BACKGROUND

On June 18, 2014, Baynes filed an administrative complaint alleging that he was the

victim of a sexual assault for which he sought $500 million in damages. Def.'s Mem., Ex. 2

(Admin. Compl.). That complaint was rejected. After exhausting his administrative remedies,

Compl. at 14 [Dkt. No. 1], Baynes filed an unsworn Complaint[1] in the United States District

Court for the Southern District of Illinois using a standard form for such complaints, which was

styled as a <u>Bivens</u> action against the warden of the United States Penitentiary ("USP") in Marion,

Illinois, where plaintiff was housed at that time; the warden of the Federal Correctional

Institution ("FCI") in Petersburg, Virginia, where he was previously housed; and a foreman at

FCI Petersburg, Jason Payne ("Payne"). Compl. at 2. As relief, plaintiff requested "mental health

screening and treatment, and financial compensation throught [sic] the Federal Tort Claim [sic]

Act (FTCA) in excess of $50,000 dollars [sic] and continuing mental health services for however

long deem [sic] appropriate by outside Mental Health proffessionals [sic]." <u>Id.</u> at 8. In the

process of conducting a threshold review of the Complaint pursuant to 28 U.S.C. § 1915A, Judge

Gilbert of the Southern District of Illinois distilled the allegations contained therein into the

following three counts:

> **Count 1**: Federal Tort Claim for compensation for the injuries Plaintiff sustained on
> April 26, 2013, as a result of the negligence of prison officials at Petersburg;
>
> **Count 2**: Eighth Amendment claim against Defendant Payne for deliberate indifference
> to Plaintiff's physical safety, for disclosing to other inmates that Plaintiff had accused
> them of stealing, thus placing him in danger;
>
> **Count 3**: Eighth Amendment deliberate indifference claim against unnamed Marion
> medical providers, for failing to treat Plaintiff's serious mental health needs

Mem. and Order at 3-4 [Dkt. No. 6], Jan. 21, 2015. Judge Gilbert then severed Count 2 into a

new action, dismissed Count 3 without prejudice for failure to state a claim, and substituted the

---

[1] For the sake of clarity, any further reference to "Complaint" denotes the complaint currently
before this Court.

United States of America for all the individual defendants named in Count 1. Id. at 8-9. After

that ruling, Baynes notified that court that he did not wish to proceed with Count 2, requesting

that it be dismissed, and he stated that he did not wish to challenge the dismissal of Count 3.

Mot. to Notify the Court [Dkt. No. 9], Feb. 3, 2015. The government then filed a Motion to

Dismiss Pursuant to Rule 12(b)(3) for Improper Venue, or in the Alternative, Motion for Change

of Venue Pursuant to 28 U.S.C. § 1404(a) [Dkt. No. 15], Mar. 30, 2015, as to Count 1, the single

count remaining in this action. On November 24, 2015, Judge Gilbert granted the motion and

ordered the action transferred to this district because all of the allegations giving rise to the claim

took place at FCI Petersburg, which is within this district. Mem. and Order [Dkt. No. 24], Nov.

24, 2015.

## II.    FACTUAL BACKGROUND

Although a pro se complaint must be read liberally, Erickson v. Pardus, 551 U.S. 89, 94

(2007), in this case there are so many contradictions and inconsistencies among the various

versions of the events that plaintiff has supplied in the initial investigation, in his administrative

complaint to the Bureau of Prisons ("BOP"), and in his opposition to the instant motion, that it is

not possible to regard any of the uncorroborated factual allegations in plaintiff's Complaint with

any degree of reliability.

### A. Allegations in Plaintiff's Complaint and Instant Pleadings

In Count 1, Baynes alleges that he was sexually assaulted on April 26, 2013 while he was

incarcerated at FCI Petersburg and working as a clerk in the laundry facility. Specifically, he

alleges that after he advised Payne that other inmates were stealing t-shirts and other items off

the shelves of the laundry facility, Payne told the accused inmates "that [Baynes] had informed

him that they were stealing" and "implyed [sic] that [Baynes] had ratted them out." Compl. at 6.

3

Count 1 further alleges that shortly thereafter, three inmates confronted Baynes about "snitching on them," jumped him and knocked him unconscious with a metal stool. Id. After he regained consciousness, Baynes saw Payne, who was "walking away from [him]," glance back at him and continue through a doorway. Id.

The Complaint alleges that after the assault, as he began to stand up, Baynes realized that his pants were "around [his] ankles and [that he] had been penetrated anally." Id. at 7. He alleges that blood and semen were on the floor, and that as he left the bathroom where he had gone to compose himself, Payne appeared, inquired about what had happened, and that he told Payne that "they jumped me and knocked me out." Id. In response, Payne asked how he would like to address the incident and plaintiff replied that he wanted revenge. Id. Baynes claims Payne told him to knock some boxes over and say that they fell on him to avoid being sent to the Special Housing Unit for fighting. Id. Baynes alleges that he followed Payne's suggestion and that, with the help of two unnamed inmates, Payne play-acted finding him and helping him off the ground. Id.

Count 1 further alleges that after Payne pretended to find plaintiff injured, he allowed Baynes go to the "hospital,"[2] but required two other inmates to accompany Baynes to ensure that he did not go to the Lieutenant's Office to report the assault. Id. at 7. Baynes claims that he was still bleeding from his head and mouth at that time and that he asked Payne to radio for emergency assistance, but that Payne refused to make the call because he needed to "clear up before [Special Investigative Services ("SIS")] came to investigate." Id. at 7-8.

Count 1 next describes Baynes' interaction with FCI Petersburg Health Services Department ("Health Services") personnel, who told the two inmates accompanying plaintiff to

---

[2] "Hospital" appears to refer to FCI Petersburg Health Services Department based on the subsequent description of what happened.

4

leave after plaintiff said he did not need them. Id. at 8. Baynes told the doctor at Health Services only that he "had an accident in laundry" and the doctor "cleaned [him] up;" he did not mention the alleged physical or sexual assault that he now claims occurred earlier that day. Id. Baynes claims that after leaving Health Services, he "waited for [his] opportunity to confront the inmates" who had attacked him, and when he did confront them, "they again tried to attack [him] but only one of them actually became physical towards [him]." Id. That inmate and Baynes allegedly "wrestled" until a point at which his opponent produced a knife and "stabbed [Baynes] in the arm." Id. FCI Petersburg staff eventually arrived and broke up the fight. Id.

When Baynes returned to Health Services for treatment of his arm, he revealed to the medical staff that he had initially lied about the source of his injuries during the previous visit because he wanted to avoid placement in the Special Housing Unit so that he could seek revenge against the alleged assailants. Id. Although he told medical staff that Payne found him unconscious after he was attacked by other inmates, he admits that he did not mention anything to medical staff about being sexually assaulted. Id. at 8-9.

As a result of the fight, Baynes was sent to the Special Housing Unit and "after a couple of hours[, he] was in alot [sic] of pain," and requested medical attention and a visit with "Lt. Norman" of SIS. Id. at 9. The staff was unable to reach Lieutenant Norman; however, medical staff responded to Baynes' request and saw him around 6:30 p.m. when he reported that he had been attacked and that he needed to see a doctor and a lieutenant.[3] Id. Medical staff told him that "everyone was gone until Monday but [that] they would pass [his] request" along. Id. Baynes alleges that Lieutenant Norman visited him on Monday, April 29, 2013. Id. Nevertheless, that

---

[3] There is no documentation corroborating Baynes' assertion that he met with medical staff on the evening of April 26, 2013.

date is contradicted by every written record in the file,[4] which uniformly show that it was not until May 1, 2013, five days after the alleged sexual assault, that Baynes first reported the sexual assault when he was interviewed by Lieutenant Norman. In that interview, Baynes claimed that he "had been sexually assaulted when [he] was knocked unconscious" and that he saw Payne walking away as he regained consciousness. Id. at 9-10. In his Complaint, plaintiff alleges that staff originally planned to take him to an outside hospital for a rape kit and further treatment, but that they eventually took him to Health Services where the head doctor decided that a rape kit would be futile because he believed all evidence was already gone by then. Id. at 10.

Baynes eventually received psychological treatment and was prescribed "psycho-tropic" medication. Id. at 9. Baynes alleges that he was told "that everything was being done to bring these [sic] people responsible for the sexual assault to justice," id.; however, all of the evidence in the record shows that after the BOP investigation, officials determined there was insufficient evidence to conclude that there had been either a physical or sexual assault on Baynes on the morning of April 26, 2013.

### B. **Inconsistencies Across Baynes' Pleadings**

There are so many glaring inconsistencies among the allegations plaintiff provided in his interview with Lieutenant Norman on May 1, 2013, the date closest to the alleged assault, in his sworn administrative complaint filed on June 16, 2014, the unsworn Complaint dated December 14, 2014, and his opposition to the government's Motion to Dismiss that it is difficult to accept

---

[4] See Lieutenant Norman's memorandum dated May 1, 2013, describing his meeting with Baynes at approximately 11:40 a.m that day. Gov't Resp., Ex. 7 (Rep. of Incident), at 4, and the medical records showing that Baynes met with Health Services on May 1, 2013 at 1:19 p.m. when he reported the sexual assault and was examined. Gov't Resp., Ex. 6 (Med. Records), at 9-10.

any of plaintiff's uncorroborated allegations as credible. In his statement to Lieutenant Norman,

which was recorded five days after the incident, he described the assault as involving being

> confronted by inmate Roddell Chapell [] [("Chappell")][5] about telling the foreman about
> the missing T-shirts. Baynes then allege[d] that inmate Edward Huckabee []
> [("Huckabee")] began arguing with him while inmate Chappell was standing behind him.
> He stated that Huckabee sucker punched him and he then grabbed both Huckabee and
> Chappell to defend himself. Baynes then state[d] that inmates Anthony Wynn []
> [("Wynn")] and Quindell Ford [] [("Ford")] engage[d] in the assault. Bayne [sic]
> allege[d] that inmate Ford choked him until he was unconscious.

> Baynes stated when he regained consciousness he was bloody about the head, face and
> his pants were pulled down to his knees. He allege[d] there was [a] big puddle of blood in
> the area where the assault took place. Bayne [sic] allege[d] that during the alleged assault
> an unknown item was inserted into his rectum.

Gov't Resp., Ex. 7 (Rep. of Incident), at 10.

In his administrative complaint, in which he sought $500 million in damages, plaintiff

named only Ford, Huckabee, and Chappell as the persons who assaulted him in the laundry

facility, and even though he was unconscious, this time from a "blow to the head by a [sic] iron

stool," he accused Ford of "pull[ing] [his] pants down and sexually assault[ing] [him]." Admin.

Compl. at 2. In contrast, in his Complaint, Baynes alleges that "three inmates confronted [him]

about snitching" and knocked him out, but he neither provides any detail about their identities

nor suggests who among them committed the sexual assault. Compl. at 6-7. Finally, in his

unsworn opposition to the government's motion, Baynes suggests for the first time that Payne

might have been the person who sexually assaulted him, stating that "it is unknown by whom the

sexual assault was performed" and that "he had been anally penetrated by either Payne or the

inmates who attacked him[,] or both." Pl.'s Opp'n at 3.

The Complaint's description of his first interaction with Health Services is also

inconsistent with Baynes' administrative complaint. In Baynes' administrative complaint, he

---

[5] There is an inconsistency in the record as to whether the spelling of this inmate's surname is
Chappell or Chapell. This opinion will use Chappell for the sake of consistency.

says that he did not tell the medical personnel what had happened to him because he "was ashamed to tell them that [he] had been sexually assaulted." Admin. Compl. at 4. The Complaint clearly states that he withheld information about the source of his injuries because he did not want to be sent to the Special Housing Unit before exacting revenge upon the inmates who he believed had assaulted him. Compl. at 8 ("I told them . . . that I had lied about what happened to me the first time because I wanted to revenge [sic] myself.").

### C. **Government's Evidence**

The government's evidence includes the investigative report conducted around the time of the incident as well as Payne's sworn declaration, which disputes most of Baynes' material allegations. Payne avers that "Baynes never reported to [him] that other inmates were stealing items from the [l]aundry [f]acility," he denies informing "any inmates that Baynes reported that they were stealing items from the [l]aundry [f]acility," and denies any involvement in the alleged assault on Baynes, stating that he was "in [his] office in the laundry room, [when] another inmate reported to [him] that something happened to Baynes in the front area of the clothing room," which is an area separated from his office by a firewall. Def.'s Mem., Ex. 1 (Payne Decl.), ¶¶ 4, 5, 7. Payne's statement is corroborated by the sworn statement of inmate Charles Brooks ("Brooks") made to investigators on May 6, 2013, in which he identified himself as the person who reported Baynes' injury to Payne after he heard a boom sound and found Baynes lying on the floor of the laundry room with gray boxes on him. Rep. of Incident at 10; see also Gov't Resp., Ex. 10 (BOP OIA Invest. Rep.), at 3. Payne's initial report of the incident, written on April 29, 2013, confirms that Brooks was the inmate who reported Baynes' injury, Rep. of Incident at 10, a statement he repeated in his affidavit provided during the BOP Office of Internal Affairs ("OIA") investigation. BOP OIA Invest. Rep. at 15.

8

In his declaration, Payne explains that after he received the report that something had happened to Baynes, he approached Baynes who was "lying face down on the floor with a plastic gray tub on his back and head. He was fully dressed. [He] asked Baynes if he was okay, and at first he did not reply. [He] touched him on the foot and again asked if he was okay, and he responded that he was. Baynes immediately told [him] that a plastic tub had fallen on him and knocked him to the floor." Payne Decl. at. ¶ 5. Payne avers that he reported the incident to Health Services and that the physician assistant with whom he spoke instructed him to send Baynes in for an injury assessment. Id. Consistent with the Complaint's allegation, he states that he directed two inmates to escort Baynes to Health Services, but contrary to the Complaint's allegation, he explains that he did so to make certain that Baynes arrived safely. Id. Brooks further corroborated Payne's account, averring that he was one of the two inmates who accompanied Baynes to Health Services. BOP OIA Invest. Rep. at 10.

Payne also avers that Baynes never reported a physical or sexual assault and denied that he "ma[de] up, suggest[ed], or otherwise assist[ed] Baynes in fabricating a story regarding his injuries." Payne Decl. ¶ 7. He also states that he was unaware of "any physical altercation involving Baynes and/or inmates in the [l]aundry [f]acility on April 26, 2013." Id. Brooks' sworn statement corroborates Payne's assertion that there was no assault, that Payne did not fabricate any story about the source of Baynes' injuries, and that Baynes was found lying on the ground with boxes on him. BOP OIA Invest. Rep. at 10. Moreover, none of the other inmates interviewed by BOP investigators confirmed plaintiff's claims that Payne confronted inmates about a theft of t-shirts, or that there was any kind of assault on Baynes during the morning of April 26, 2013.

The medical records from Baynes' treatment also significantly conflict with Baynes' versions of his injuries. Specifically, the record of Baynes' visit to Health Services on April 26, 2013 at 9:43 a.m., just after the laundry room incident, shows the doctor finding that Baynes had a superficial laceration to his lower lip and scalp with no swelling or hemorrhaging and that Baynes reported receiving these injuries as a result of climbing on a shelf to move boxes, falling, and having some boxes land on him. Gov't Resp., Ex. 6 (Med. Records), at 6. The minor treatment Baynes received and this diagnosis are inconsistent with Baynes' claim in his Complaint that when he regained consciousness there was a pool of blood on the floor. Specifically, the medical record does not reveal any finding of an open wound or hemorrhaging less than an hour after the incident. Indeed, further indicating the insignificance of Baynes' injuries, the doctor chose to merely "cleanse[ the] abrasions." Id. at 7. No sutures were needed and no prophylactic antibiotics were ordered, which would be consistent with the degree of injury Baynes described. Id. Likewise, all of Baynes' vital signs were normal and the medical record does not mention any sign of physical, emotional, or mental distress. Id.

Moreover, as previously discussed, contrary to his allegations in the Complaint that he first reported the sexual assault to Lieutenant Norman and saw Health Services on April 29, 2013, the record clearly establishes that it was not until five days after the laundry room incident, on May 1, 2013, that Baynes first reported the alleged sexual assault and visited Health Services to be examined for a sexual assault. See, e.g., Rep. of Incident at 1, 4. During his May 1, 2013 visit to Health Services, he told the doctor that the cause of his injury was that "[he] was attacked in the laundry room and choked and fell unconscious and when [he] came around [his] pants and underpants were pulled down below [his] buttocks and it felt like something had went inside [his] rectum." Med. Records at 9. He reported symptoms of pain and burning in his rectum when

defecating. Id. Although the doctor found that plaintiff's anus was tender on palpitation, he did not find any open wound, trauma, bleeding, swelling, ecchymosis (skin bruising),[6] or erythema (skin redness),[7] which would have been consistent with a sexual assault. Id. at 9-10. The treatment prescribed consisted of a weeklong course of ibuprofen and sexually transmitted disease testing, and a suggestion that Baynes seek psychological counseling. Id.

At approximately 11:40 a.m. on May 1, 2013, Lieutenant Norman interviewed Baynes, who specifically identified four other inmates, Ford, Huckabee, Chappell, and Wynn,[8] as the perpetrators of the assault, and he did not mention Payne as having any involvement. Rep. of Incident at 2. Indeed, Baynes initially identified his sexual assaulters as Wynn and Ford, which is inconsistent with his suggestion in his opposition to defendant's Motion to Dismiss that Payne "may" have committed the sexual assault. Plaintiff's May 1, 2013 description of the assault is likewise inconsistent with the claim in his administrative complaint that Ford was the only inmate who committed the sexual assault, Admin. Compl. at 2, and differs from his administrative complaint and the Complaint, wherein Baynes alleged that three, not four, inmates attacked him. Id.; Compl. at 6. Furthermore, Baynes reported on May 1, 2013 that he fell unconscious as a result of being choked by Ford, Rep. of Incident at 2, whereas in his administrative complaint and the Complaint he alleges that he was knocked unconscious with a metal stool. Admin. Comp. at 2; Compl. at 6. Finally, on May 1, 2013, he reported that there was a "big puddle of blood in the area w[h]ere the assault took place," id. at 5, an assertion that is not supported by the medical report from his visit to Health Services less than an hour after the alleged incident.

---

[6] "Ecchymosis," Dorland's Med. Dictionary (26th ed. 1981).

[7] "Erythema," Dorland's Med. Dictionary (26th ed. 1981).

[8] This is the only time Wynn is accused in any of Baynes' versions of events.

The Report of Incident includes interviews prison officials conducted during the course of their investigation of plaintiff's allegations, which was initiated on May 1, 2013, in conformance with their protocols under the Prison Rape Elimination Act of 2003 ("PREA"), 42 U.S.C. § 15601 et seq. All of these interviews took place less than a week after Baynes initially reported the sexual assault to Lieutenant Norman, demonstrating that BOP officials acted in good faith in accepting Baynes' allegations and thoroughly and immediately investigated his allegations. In Payne's initial account of the incident, dated before Baynes raised any claim of sexual assault, he wrote that on April 26, 2013 around 8:30 a.m., Brooks approached him to report that something had happened to Baynes. Rep. of Incident at 11. In response, he walked to the front section to the laundry where he found Baynes lying face down on the floor with a plastic gray tub on his back and on his head. Id. Payne told investigators that he sent Baynes to Health Services and allowed another inmate to walk there with him. Id. Payne's version of the events has remained consistent throughout these proceedings.

Prison officials interviewed three inmates, including Brooks, who were in or around the laundry facility at the time, and all stated that they did not witness an assault of any kind. Id. In addition, each confirmed that he had either first-hand knowledge or contemporaneous second-hand knowledge that boxes had fallen on Baynes and that he was sent to Health Services to be seen. Id. Furthermore, in his sworn statement, Brooks averred that Baynes told him and Payne that he was "getting some t-shirts down when he slip [sic] and fell the boxes came down on him," and that Payne asked Baynes several more times how he got injured and Baynes offered the same answer. Id. Lastly, Brooks specifically indicated that he, like Baynes, is a member of the Muslim community, and that he "would not have stood by and allowed any type of assault to occur with Baynes and not intervene." Id. These relatively contemporaneous accounts

significantly discredit Baynes' allegations that he was assaulted by anyone, let alone sexually assaulted, and that Payne told him to lie about the cause of his injuries. Moreover, because there is no indication that Brooks harbored any prejudice against Baynes, his account is extremely credible.

Upon completion of their investigation, prison officials concluded that Baynes' reports of a sexual assault and of misconduct by Payne were unsubstantiated. All of the alleged perpetrators denied any involvement in a sexual assault, no eyewitnesses corroborated Baynes' allegations, and the medical evidence did not indicate any sexual injury. Id. at 12.

The Report of Incident also recounts the altercation that took place during the afternoon of April 26, 2013 between Baynes and Ford, who staff reported were "striking each other in the facial and upper body torso area with closed fists." Id. at 12. Notably, two of the inmates who were interviewed during the course of the investigation of that incident mentioned some variation of the theory that "Baynes is just trying to get back at [Ford] for the fighting incident on Friday, April 26, 2013." Id. at 11. This altercation was apparently fairly serious in nature, as medical assessments recounted in the Discipline Hearing Office Report revealed that "Ford sustained multiple cuts and abrasions[:] 4 cm to the right side of head, 3 cm left shoulder laceration, 1 cm left shoulder laceration, 2 1/2 cm laceration back of head, 1/2 cm back abrasion and 5cm abrasion on left arm." Gov't Resp., Ex. 9 (Discipline Hr'g Off. Rep.), at 2. Although Baynes claimed self-defense, the investigation revealed that the "incident allegedly was escalated from a previous disrespect issue in [sic] which occurred earlier during the day." Id. at 15. The investigators also mentioned that Baynes had a history of fighting, whereas Ford had no history of incident reports. Id.

## III.   DISCUSSION

The government argues that the scope of the remaining count in the Complaint is limited to the alleged acts or omissions by BOP personnel that resulted in other inmates attacking and sexually assaulting Baynes on April 26, 2013 in the laundry facility. The government further contends that this claim should be dismissed because the alleged negligent conduct of the FCI Petersburg staff on April 26, 2013 falls into the discretionary function exception to the FTCA and the claims are therefore barred by sovereign immunity. The government also argues that Baynes' allegations that Payne may have sexually assaulted him and failed to report the sexual assault were never raised during the administrative process and are therefore barred as unexhausted claims. Baynes argues in response that the claim includes all of the acts and omissions of the FCI Petersburg staff on April 26, 2013, both before and after the incident, including Payne's failure to report the sexual assault, his possible participation in the sexual assault, and medical staff's failure to perform an appropriate rape evaluation including use of a rape kit.

### A.  **Standard of Review**

Summary judgment is merited where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion," id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (internal quotation marks omitted)), all inferences drawn in the nonmovant's favor must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient" to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248, and any existing factual dispute must be both "material" and "genuine," such that it has the potential to "affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).

### B. Exhaustion as to the Claims that Payne Committed the Sexual Assault and/or that Payne Improperly Failed to Report It

In contrast to the sworn administrative complaint in which plaintiff named Ford as the person who sexually assaulted him, plaintiff now alleges for the first time in his opposition to the government's Motion to Dismiss that "it is unknown by whom the sexual assault was performed," and that it could have been performed "by either Payne or the inmates who attacked him or both." Pl.'s Opp'n at 5. Plaintiff also alleges for the first time in his opposition that "Payne had an [sic] duty to report the assault when he observed plaintiff face down on the ground," apparently implying that Payne should have known he was sexually assaulted, Pl.'s Opp'n at 3; however, in the same pleading, he contradicts himself by stating that he only reported the sexual assault to BOP staff for the first time on April 29, 2013, three days after the April 26 incident.[9] Id. Although the government raises several arguments against these newly-raised claims, including that these claims exceed the scope of Judge Gilbert's limiting of

[9] Plaintiff has not addressed the evidence in the record that it was not until May 1, 2013 when he first reported having been sexually assaulted.

plaintiff's claims to the events occurring on April 26, 2013 and that they were not properly exhausted, the Court finds that they are clearly barred because Baynes failed to properly exhaust his administrative remedies.

"The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." McNeil v. United States, 508 U.S. 106, 113 (1993). The FTCA stipulates that

> [a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a). Such a claim must be presented in writing within two years after it accrues; otherwise, it is "forever barred." 28 U.S.C. § 2401. As the Fourth Circuit has explained, "dismissal is mandatory when a plaintiff fails to file a claim with the proper administrative agency," Henderson v. United States, 785 F.2d 121, 124 (4th Cir. 1986), because it is a "key jurisdictional prerequisite to filing suit under the FTCA." Kokotis v. U.S. Postal Serv., 223 F.3d 275, 278 (4th Cir. 2000). This jurisdictional requirement may not be waived. Id.

Even reading the administrative complaint generously, it is entirely devoid of any allegations that could fairly encompass the suggestion that Payne committed the sexual assault or that Payne knew about the sexual assault on April 26, 2013. Indeed, throughout the administrative complaint Baynes specifically identifies three inmates, Ford, Huckabee, and Chappell, as the persons who assaulted him. Admin. Compl. at 4. Similarly, in his administrative complaint, Baynes stated that when Payne found him after he was allegedly assaulted and asked him what had happened, he "told [Payne] that they [sic] inmates Ford, Huckabee and Chappell had jumped me and left me unconscious." Admin. Compl. at 2. Because there is no indication in

the administrative complaint that Baynes timely raised a claim that Payne either participated in a sexual assault or had knowledge of one and failed to report it, these claims have not been properly exhausted and will be dismissed.

### C. FTCA's Discretionary Function Exception

The government's primary argument on the merits is that this action is barred by the discretionary function exception to the FTCA, and accordingly that the Court lacks subject matter jurisdiction over any of Baynes' remaining claims. Def.'s Mem. at 10. Although the FCTA waives the federal government's sovereign immunity for liability arising from negligent or wrongful acts or omissions of any government employee acting within the scope of his office or employment, see 28 U.S.C. §§ 1346(b), 2674, it contains several exceptions to its waiver of sovereign immunity. Among these exceptions is the discretionary function exception, which "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984); McMellon v. United States, 387 F.3d 329, 335 (4th Cir. 2004).

#### 1. The Scope of Plaintiff's Remaining Claims

There is some dispute about the precise "nature of conduct" encompassed by plaintiff's claim. When determining the applicability of the discretionary function exception, a court must first ascertain the contours of the acts or omissions at issue. Williams v. United States, 50 F.3d 299, 309 (4th Cir. 1995). This initial inquiry is essential because "[i]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Varig Airlines, 467 U.S. at 798.

The government characterizes Baynes' claims as "limited to those acts or omissions that allegedly precipitated the sexual assault on Plaintiff by other inmates in the laundry facility on

April 26, 2013." Def.'s Mem. at 10. In support of this argument, the government cites to Judge

Gilbert's order, which characterized the count at issue as a "Federal Tort Claim for compensation

for the injuries Plaintiff sustained on April 26, 2013 as a result of the negligence of prison

officials at Petersburg." Id. (citing Mem. and Order at 3). The government also points to Judge

Gilbert's adoption in toto of a magistrate judge's Report and Recommendation, which described

Count 1 as including "allegations that, while he was incarcerated at FCI Petersburg, correctional

officer(s) were negligent when Baynes was attacked by other inmates." Id. (citing Report and

Recommendation at 2 [Dkt. No. 21], Nov. 16, 2015, adopted by Mem. and Order [Dkt. No. 24],

Nov. 24, 2015). As such, the government contends that the claim is essentially one of negligence

based on FCI Petersburg staff's failure to protect Baynes from other inmates. Id. at 11. The

government nonetheless makes the small concession that the claim may be alternatively

construed to also incorporate a claim that Payne's investigation of Baynes' report of the alleged

t-shirt theft was negligent. Id. Baynes argues in response that the government's characterization

of his claim is unduly narrow; rather, his claim encompasses "conduct of bureau of prisons [sic]

or other federal employee's [sic] that occurred after [the sexual assault] incident." Pl.'s Opp'n at

2.

      The "doctrine [of law of the case] applies as much to the decisions of a coordinate court

in the same case as to a court's own decisions," Christianson v. Colt Indus. Operating Corp., 486

U.S. 800, 816 (1988); accordingly, this Court is bound by the Southern District of Illinois'

decisions unless there is a strong justification to warrant departure. See Sejman v. Warner-

Lambert Co., 845 F.2d 66, 69 (4th Cir. 1988). The language from Judge Gilbert's orders quoted

by both Baynes and the government suggests that the claim encompasses a scope of conduct that

falls somewhere between what each party has proposed. The characterization of the count as a

"Federal Tort Claim for compensation for the injuries Plaintiff sustained on April 26, 2013 as a result of the negligence of prison officials at Petersburg," Mem. and Order at 3, does not explicitly limit the claim to conduct before or after the incident on April 26, 2013. Indeed, negligence by FCI Petersburg staff in responding to the incident, whether in their investigation or medical treatment, is fairly included within this language, along with any acts or omissions that precipitated the incident. Nevertheless, Judge Gilbert's description suggests that the "nature of conduct" at issue is negligent acts or omissions on April 26, 2013, not in the days and weeks after, as Baynes contends. This conclusion is further supported by the excerpt from Judge Williams' Report and Recommendation quoted by the government, which portrays the count as composed of allegations that "correctional officer(s) were negligent when Baynes was attacked by other inmates." Report and Recommendation at 2. One could not fairly characterize this language as limiting the conduct at issue to negligence that resulted in the attack to the exclusion of negligence that caused injury to Baynes in the aftermath. Accordingly, the "nature of conduct" encompassed by the claim is the allegedly negligent acts or omissions on the part of FCI Petersburg staff that caused injury to Baynes on April 26, 2013, whether the injury arose from the physical attack or the sexual assault, or defendant's response thereto. Specifically, Baynes' claim is limited to any actions Payne took that allegedly precipitated the assault, Payne's failure to protect Baynes, and the BOP medical staff's failure to perform a rape kit. Pl.'s Opp'n at 1-2.

　　　2. Application of the Discretionary Function Exception

　　　The discretionary function exception excludes from the FTCA's waiver of sovereign immunity "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or

perform a discretionary function or duty on the part of a federal agency or an employee of the

Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). As such, if

a claim falls within the ambit of the discretionary function exception, a court lacks subject matter

jurisdiction to entertain the suit. Piechowicz v. United States, 885 F.2d 1207, 1215 n.1 (4th Cir.

1989). Moreover, a court determining the applicability of the discretionary function exception

must resolve all ambiguities in favor of the United States because "waivers of sovereign

immunity 'must be construed strictly in favor of the sovereign and not enlarged beyond what the

language requires.'" McMellon, 387 F.3d at 340 (quoting United States v. Nordic Village, Inc.,

503 U.S. 30, 34 (1992) (internal citations omitted)).

Courts evaluating the applicability of the discretionary function exception to a claim

under the FTCA must engage in a two-prong inquiry. United States v. Gaubert, 499 U.S. 315,

323-24 (1991); Berkovitz v. United States, 486 U.S. 531, 536 (1988). "First, a court considers

whether the challenged governmental conduct involves an element of judgment or choice. When

a statute, regulation, or policy prescribes a specific course of action, there is no discretion and the

exception does not apply." Rich v. United States, 811 F.3d 140, 144 (4th Cir. 2015) (internal

citation omitted). Furthermore, the exception will not shield a government actor's acts or

omissions that run afoul of the express or implied prescriptions of a statute, regulation, or policy.

Baum v. United States, 986 F.2d 716, 720 (4th Cir. 1993). If there is no statute, regulation, or

policy that directs the government actor's conduct, or if it affords broad discretion in the

implementation of its directives, a court must proceed to the second prong of the inquiry. Id.

The second prong requires a court to "determine whether the judgment was one that the

exception was designed to protect, namely, a judgment based on considerations of public

policy." Rich, 811 F.3d at 144. The Fourth Circuit has explained that "[t]his requirement is

consistent with and mandated by the general purpose underlying the FTCA and the discretionary function exception, i.e., to balance Congress' desire to allow redress of injuries suffered through the negligence of government actors against the need to protect the government from being hobbled in the discharge of its policy-driven duties by tort suits." Baum, 986 F.2d at 720. Not all acts involving any discretion performed by a government actor within the scope of his employment are protected by the discretionary function exception. The Supreme Court offered the following example to illustrate the limits of the exception:

> If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

Gaubert, 499 U.S. at 325 n.7. Furthermore, this analysis is not "a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function," rather a court must "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." Baum, 986 F.2d at 721. Moreover, because there is a "well-established presumption that public officials have properly discharged their official duties," a court may "not assume that government agents, in undertaking actions of the type normally thought to involve policy choices, in a particular case acted arbitrarily or on whim, disregarding those essential policy questions. . . . [Accordingly,] the presence or absence of evidence that involved government agents . . . did or did not engage in a deliberative process before exercising their judgment" is largely inapposite. Id.

      3. Payne's Alleged Role in Precipitating the Assault and Failure to Protect

      Even drawing all inferences in favor of plaintiff, the sworn testimony provided by the government, medical records, and Baynes' multiple conflicting descriptions of what happened on

April 26, 2013 significantly undercut the credibility of his allegations. Indeed, in light of the record, at best it appears that Payne's actions were limited to his decision to send Baynes to the infirmary when he found him on the floor of the laundry facility. Nevertheless, even if the Court assumes Baynes' allegations in the Complaint regarding Payne confronting laundry facility inmates about Baynes' report that they were stealing t-shirts were true, Payne's actions are shielded by the discretionary function exception. First, any decision about whether or how to confront the other inmates with Baynes' supposed allegation of their stealing t-shirts would have involved an "element of judgment or choice." Neither party has proffered any regulations or policies that prescribe any specific course of action when such allegations of theft are made. Moreover, to the extent such regulations or policies exist, there is no evidence that they preclude a prison official from confronting an inmate who has been accused of an infraction. Indeed, the government has provided a declaration of Richard Engel, an Associate Warden at Federal Correctional Complex ("FCC") Petersburg, who avers that

> [t]here are no rules, regulations, or mandatory directives of any sort which specifically govern a Laundry Foreman's day-to-day supervision of inmates who are assigned to work or are otherwise present in the Laundry Facility of FCC Petersburg. Likewise, there are no rules, regulations, or policy directives of any sort which specifically govern a Laundry Foreman's actions in investigating or addressing an inmate's report of misconduct on the part of another inmate in the Laundry Facility, or which prohibit a Laundry Foreman from disclosing the identity or source of such a report of inmate misconduct when investigating or addressing the report.

Def.'s Mem., Ex. 3 (Engel Decl.), ¶ 3. Engel also avers that BOP Laundry Foremen such as Payne are afforded broad discretion over "how to maintain safety and order within the Laundry Facility, and how to enforce the accountability of laundry items and equipment, including when and how to investigate allegations by one inmate against another for stealing laundry items." Id. ¶ 4. There is no evidence in the record that contradicts this sworn declaration. As such, the first prong of the discretionary function exception analysis is satisfied.

22

The second prong, whether the judgment was based on public policy concerns, is also satisfied. In Rich v. United States, the Fourth Circuit found that a prisoner's FTCA claim that prison officials failed to protect him from being severely beaten and stabbed in a recreation area by several other inmates was barred by the discretionary function exception. 811 F.3d at 142. The court based its finding on the statute that mandates the BOP's obligation to keep inmates safe:

> The BOP is required to provide for the "protection," "safekeeping," and "care" of "all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2), (3). Under the statute's broad directives, the BOP retains discretion regarding the implementation of those mandates.

Id. at 145. In addition, the Fourth Circuit remarked that "prisoner placement and the handling of threats posed by inmates against one another[, which] are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons." Id. (internal citations omitted). "Factors such as available resources, proper classification of inmates, and appropriate security levels are inherently grounded in social, political, and economic policy." Id. (internal quotation marks omitted). A prison official's decision about how to handle accusations of a theft incidents fall within the same rubric as prisoner placement and handling as it equally implicates "[f]actors such as available resources, proper classification of inmates, and appropriate security levels." Accordingly, the Court does not have subject matter jurisdiction to consider Baynes' claims as to how Payne handled the alleged theft report and his failure to protect Baynes from an assault because these claims trigger the discretionary function exception.

### 4. The BOP Medical Staff's Failure to Conduct a Rape Kit

Baynes' claim that he was injured by the BOP medical staff's failure to arrange for a rape kit on May 1, 2013 when he was examined for the first time after reporting the alleged sexual

assault to BOP officials is barred by the discretionary function exception. As to the first prong of the exception, no statute or regulation in this record requires BOP medical officials to provide for a rape kit whenever a sexual assault is alleged regardless of how far in the past it took place. Rather, pursuant to regulations promulgated under PREA, "[t]he [BOP] shall offer all victims of sexual abuse access to forensic medical examinations, whether on-site or at an outside facility, without financial cost, <u>where</u> <u>evidentiarily</u> or medically appropriate." 28 C.F.R. § 115.21 (emphasis added). This regulation explicitly provides discretion to BOP staff to ascertain when a rape kit or other forensic medical examination would be "evidentiarily or medically appropriate." Moreover, the "BOP is by no means required to tailor a perfect plan for every inmate; while it is constitutionally obligated to provide medical services to inmates, these services need only be on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." <u>United States v. Derbes</u>, 369 F.3d 579, 583 (1st Cir. 2004) (internal citations and quotation marks omitted). Without an absolute requirement that BOP medical staff provide for a rape kit or other forensic medical examinations in all cases in which a sexual assault is claimed, BOP medical officials are afforded discretion to treat patients and administer tests in accordance with professional standards and evidentiary appropriateness. As such, the first prong of the exception is satisfied.

      With regard to the second prong, although medical treatment is certainly guided by the individualized needs of each prisoner, the discretion of medical staff in BOP facilities is also clearly guided by policy considerations. As the Eleventh Circuit has found, "in determining the precise course of medical treatment to pursue, several policy considerations are relevant [to the discretion of BOP medical staff], including prison security, the allocation of finite resources, and the logistics of prisoner transportation if transfer to an off-site facility is an option." <u>Cosby v.</u>

U.S. Marshals Serv., 520 F. App'x 819, 821 (11th Cir. 2013). The doling out of finite resources

like rape kits and the medical staff's time and energy requires careful policy analysis to ensure

that the "protection," "safekeeping," and "care" of the prison population is carried out to the

greatest degree. 18 U.S.C. § 4042(a)(2), (3). Accordingly, with the second prong satisfied, the

discretionary function exception bars this claim and the Court lacks jurisdiction to consider it.[10]

IV.    CONCLUSION

For the reasons stated above, the United States' Motion to Dismiss [Dkt. No. 30],

converted by the Court to a Motion for Summary Judgment, will be GRANTED by an

appropriate Order to be issued with this Memorandum Opinion.

Entered this 25 day of August, 2016.

Alexandria, Virginia

                                                        /s/
                                        _____
                                        Leonie M. Brinkema
                                        United States District Judge

---

[10] Moreover, even if this claim were not barred by the discretionary function exception it would fail on at least two other grounds. First, as the government correctly argues, there is no Virginia state law analogue to a cause of action for failure to perform a rape kit. Reply at 7. Because the FTCA imposes liability on the federal government "only to the extent that 'a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred,'" Anderson v. United States, 669 F.3d 161, 164 (4th Cir. 2011) (quoting 28 U.S.C. § 1346(b)(1)), Baynes may not maintain an FTCA claim for BOP medical staff's failure to perform a rape kit. Second, even if this claim is construed liberally to fall under the umbrella of medical malpractice, it would fare no better. Pursuant to the Virginia Medical Malpractice Act ("VMMA"), Va. Code § 8.01-581.1 et seq., every complaint raising a claim for malpractice must certify that a plaintiff has obtained "a written opinion signed by an expert witness" that opines "based upon a reasonable understanding of the facts, the defendant . . . deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed." Va. Code § 8.01–20.1. There is no suggestion anywhere in the record that plaintiff obtained the requisite certification; accordingly, this claim still fails even if it is cast as a medical malpractice claim. See Sowers v. United States, 141 F. Supp. 3d 471, 476–78 (E.D. Va. 2015).